**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SYLVAN LEARNING INC.,** | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:11-00236-KD-B** |
| | ) | |
| **LEARNING SOLUTIONS, INC.,** | ) | |
| *et al.*, | ) | |
|     **Defendants.** | ) | |

**ORDER**

This matter is before the Court on the Plaintiff's Motion for Preliminary Injunction (Doc. 2), the Response in opposition of the Defendants (excluding Defendant Richard E. Blow[1]) (Doc. 25), and the Plaintiff's Reply (Doc. 31). For the reasons set forth herein, Plaintiff's motion is due to be **GRANTED** in part and **DENIED** in part.

**I.      Facts**

Plaintiff Sylvan Learning Inc. ("Sylvan") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Baltimore, Maryland. (Doc. 1 at 1, ¶ 1). Sylvan has developed certain proprietary programs, systems, teaching and management techniques, individualized diagnostic tests and academic and prescriptive educational courses and programs which are designed to be personally taught, supervised, and administered by trained instructors (the "Sylvan System") for use in operating centers ("Sylvan Centers"). (E.g., Doc. 1-1 at 2). Sylvan licenses the Sylvan System to others for use in operating Sylvan Centers. (Id.). Such centers are identified by certain trade names, trademarks,

---

[1] Richard Blow has filed for bankruptcy since the commencement of this action (Doc. 19), and all proceedings in this action have been stayed as to him (Docs. 22, 28, 29).

service marks, logos, symbols, and other indicia of origin (collectively, "Licensed Marks"). (Id.).

On June 29, 2003, Defendant Learning Solutions, Inc. ("LSI") executed License Agreements with Sylvan allowing it to operate two Sylvan centers: one in the territory consisting of Hancock County, Mississippi (Doc. 1-2), and one in the territory consisting of Forrest and Lamar Counties, Mississippi (Doc. 1-3) (collectively, the "Mississippi Agreements"). The agreements granted LSI "a license to use the Sylvan System and the Licensed Marks" at Sylvan Centers it opened and operated within the agreements' prescribed territories. (Doc. 1-2 at 3, ¶ 1.1; Doc. 1-3 at 3, ¶ 1.1).

The Mississippi Agreements contain provisions allowing for them to be terminated prior to their expiration under certain conditions. (Doc. 1-2 at 18, ¶ 9.4; Doc. 1-3 at 20, ¶ 9.4). With regard to such conditions, both agreements state the following:

> 10.3 <u>Material Breaches That Cannot Be Cured</u>. Sylvan may terminate this Agreement, effective on the sooner of delivery or three days after mailing a written declaration of termination to the Licensee if any one or more of the following material, non-curable breaches of this Agreement occur:
> . . .
>> 10.3.3 Any act causing an incurable tarnishment of Sylvan's reputation.
>> . . .
>> 10.3.5 The insolvency, bankruptcy, or reorganization of the Licensee under the bankruptcy laws.
>> . . .
>> 10.3.8 The conviction of Licensee of a felony or misdemeanor relevant to the operation of the [Sylvan] Center.

(Doc. 1-2 at 20-21, ¶ 10.3; Doc. 1-3 at 22-23, ¶ 10.3).

LSI is named as "Licensee" in the Mississippi Agreements. (Doc. 1-2 at 2; Doc. 1-3 at 2).

On March 25, 2009, Defendant Baldwin Management ("Baldwin") executed a License Agreement with Sylvan allowing it to operate a Sylvan center in the territory consisting of that area of Baldwin County, Alabama, lying south of Interstate 65 (the "Alabama Agreement") (Doc. 1-1). The agreement granted Baldwin "a license to use the Sylvan System and the Licensed Marks" at Sylvan centers it opened and operated within its prescribed territory. (<u>Id.</u> at 3, ¶ 1.1).

The Alabama Agreement also contains provisions allowing for it to be terminated prior to its expiration under certain conditions. (<u>Id.</u> at 20, ¶ 9.4). With regard to such conditions, the Alabama agreement states the following:

> 10.3    <u>Material Breaches That Cannot Be Cured</u>.    Sylvan may terminate this Agreement, effective on the sooner of delivery or three days after mailing a written declaration of termination to the Licensee if any one or more of the following material, non-curable breaches of this Agreement occur:
> . . .
> 10.3.3 Any act causing an incurable tarnishment of Sylvan's reputation.
> . . .
> 10.3.5 The insolvency, bankruptcy, or reorganization of the Licensee under the bankruptcy laws.
> . . .
> 10.3.8 Any act by Licensee or any person listed on the signature page hereof that . . . b) results in any charge of, conviction of or pleading of nolo contendere to a felony

(<u>Id.</u> at 22, ¶ 10.3).

Baldwin is named as "Licensee" in the Alabama Agreement. (<u>Id.</u> at 2).

Defendant Richard E. Blow was a signatory to all three License Agreements. (Doc. 1-1 at 30; Doc. 1-2 at 30; Doc. 1-3 at 30, 32). Richard Blow signed the Mississippi Agreements in his capacity as President and 50% shareholder of LSI, and he signed the Alabama Agreement in his capacity as President of and 37.5% interest holder in Baldwin. (<u>Id.</u>).

On October 27, 2010, Richard Blow was charged with two counts: one of bank fraud and one of conspiracy to commit bank fraud, both counts being felonies. (Doc. 1-4). After a non-jury trial occurring on March 1 and 2, 2011, in the Southern District of Alabama, Richard Blow was convicted of both counts. (Doc. 1-7; Case No. 1:10-cr-00238-WS-M-1, Doc. 70).

Sylvan sent Richard Blow a letter and notice dated April 1, 2011, in which it stated that it was terminating the Mississippi Agreements between it and LSI, effective the sooner of April 4, 2011, or delivery of the letter. As justification, Sylvan cited to Paragraph 10.3.8 of the agreements, stating that "any act by Licensee or any person listed on the signature pages of the License Agreements that results in any charge of, conviction of, or pleading of nolo contendere to a felony is an incurable breach under the License Agreements[,]" by which "Sylvan has the right to terminate the License Agreements[.]"[2] (Doc. 1-5 at 2). A letter was also sent to Richard Blow terminating the Alabama Agreement with Baldwin no later than April 4, 2011. (Doc. 1-6 at 2).[3] Sylvan later sent Richard Blow follow-up letters, noting that he and the other interest-holders in LSI and Baldwin were still operating their Sylvan Centers and that they had not complied with their post-termination obligations. The letters gave them until April 15, 2011, to certify compliance with these obligations and threatened legal action if this was not done. (Doc. 1-6). In spite of this, LSI and Baldwin continue to operate their respective learning centers as Sylvan Centers using Sylvan's Licensed Marks. (Transcript, Motion Hearing of May 25, 2011).

---

[2] Paragraph 10.3.8 of the Mississippi Agreements does not contain language related to charges or pleadings of nolo contendere. See supra.

[3] This exhibit merely refers to such a letter. The actual letter is not in evidence.

All three License Agreements contain the following provision:

> 12.    Injunctive Relief and Liquidated Damages
>
> Licensee acknowledges that Sylvan's remedy at law for Licensee's breach of Paragraph 3, Paragraph 11.1, or Paragraph 11.5 would be inadequate and that, accordingly, in such events, Sylvan shall be entitled to immediate injunctive relief . . .

(Id. at 25; Doc. 1-2 at 23; Doc. 1-3 at 25).

Paragraph 3.2.2 of each of the agreements states:

> Licensee understands and agrees that any use of [Sylvan's] Licensed Marks other than as expressly authorized by this Agreement, without Sylvan's prior written consent, is an infringement of Sylvan's rights in the Licensed Marks and that the right to use the Licensed Marks granted herein does not extend beyond the termination or expiration of this Agreement.  Licensee expressly covenants that, during the term of this Agreement and thereafter, Licensee shall not, directly or indirectly, commit any act of infringement . . .

(Doc. 1-1 at 5-6; Doc. 1-2 at 6; Doc. 1-3 at 8).

Each License Agreement contains an identical Paragraph 11.1, under which the Licensee agrees to undertake certain actions immediately upon the termination of the agreement.  Such actions include ceasing to operate under the Sylvan name and using Sylvan's Licensed Marks, returning proprietary, confidential or trade secret materials to Sylvan, removing and destroying all signs, designs and insignia indicating that the Licensee is connected with Sylvan, ceasing to use its Sylvan Center phone numbers and transferring them to Sylvan upon demand, and refraining from contacting its Sylvan Center customers except in certain circumstances (collectively, "post-termination obligations").  (Doc. 1-1 at 23-24; Doc. 1-2 at 21-22; Doc. 1-3 at 23-24).  Defendants have not undertaken any of these obligations since the agreements were terminated.  (Transcript, Motion Hearing of May 25, 2011).

Paragraph 11.5.2 (the "non-compete covenant") of each of the three agreements states as

follows:

> In the event this Agreement is terminated, . . . then in such event Licensee covenants, for a period of two (2) years after such termination . . . not to engage as an owner, operator, or in any managerial capacity, in any educational business offering individualized diagnostic tests or academic or prescriptive educational programs which are designed to be personally taught, supervised or administered by trained instructors, or in any educational business offering programs or services competitive with programs or services available at Sylvan Learning Center during the term of this Agreement and at the time of termination . . . of this Agreement, and which programs or services Licensee offered at its Center during the two (2) year period prior to the termination . . . of this Agreement, within the Territory or at any location less than five (5) miles from the Territory boundary, other than as an authorized licensee of another Sylvan Center. It is understood and agreed that the purpose of this covenant is not to deprive Licensee of a means of livelihood and will not do so, but is rather to protect the goodwill and interest of Sylvan and the Sylvan System.

(Doc. 1-1 at 25; Doc. 1-2 at 23; Doc. 1-3 at 25).

In addition to the agreement's Licensee, the "non-compete clause" is binding on the Licensee's "partners, directors, officers, and stockholders[,]" if the Licensee is a corporation or a partnership. (Doc. 1-1 at 24, ¶ 11.5; Doc. 1-2 at 22, ¶ 11.5; Doc. 1-3 at 24, ¶ 11.5).

Finally, all three agreements contain the following provision:

> 19. <u>Jurisdiction and Venue.</u>
>
> THE PARTIES AGREE THAT THIS AGREEMENT SHALL BE INTERPRETED AND ENFORCED ACCORDING TO THE LAWS OF THE STATE OF MARYLAND, EXCEPT AS TO THOSE PROVISIONS OF THIS AGREEMENT THAT MAY NOT BE ENFORCEABLE UNDER THE LAWS OF SAID STATE; IN WHICH EVENT, THAT PROVISION(S) SHALL BE INTERPRETED AND ENFORCED ACCORDING TO THE LAWS OF THE STATE IN WHICH THE TERRITORY DESCRIBED HEREIN ON EXHIBIT A LIES. IN THE EVENT EITHER PARTY INITIATES ANY LITIGATION OR LAWSUIT UNDER THIS AGREEMENT, OR RELATING IN ANY WAY TO THE RELATIONSHIP OF THE PARTIES AS FRANCHISOR AND FRANCHISEE, THAT PARTY AGREES THAT VENUE PROPERLY LIES IN THE COURTS OF THE STATE WHERE THE OTHER PARTY THEN HAS ITS PRINCIPAL PLACE OF

BUSINESS (PRESENTLY BALTIMORE CITY, MARYLAND IN THE CASE WHERE SYLVAN IS DEFENDANT) OR THE TERRITORY IS LOCATED (IN THE CASE WHERE LICENSEE IS DEFENDANT), AND WILL FILE SUCH LITIGATION OR LAWSUIT ONLY IN SUCH COURT.

(Doc. 1-1 at 27, ¶ 19; Doc. 1-2 at 25, ¶ 19; Doc. 1-3 at 27, ¶ 19).

The License Agreement covering Forrest and Lamar Counties in Mississippi contains an additional provision stating:

This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland but not including its provisions concerning conflicts of law. Any dispute between the parties concerning this Agreement, its validity or the relationship created hereunder shall be settled in accordance with the procedures set forth in the License Agreement.

(Doc. 1-3 at 6, ¶ 3.1).

## II.    Procedural History

On May 12, 2011, Sylvan filed a Verified Complaint against the Defendants, alleging trademark infringement, unfair competition, breach of contract, and violations of Alabama's and Mississippi's Trade Secrets Acts.  (Doc. 1).  That same day, Sylvan also filed a "Motion for a Temporary Restraining Order and for a Preliminary Injunction" (Doc. 2), which the Court treats as a motion for preliminary injunction (Doc. 6).  A hearing on Sylvan's motion was held on May 25, 2011, and a briefing schedule was set (Doc. 21).

## III.   Standard of Review

Our sister court in the Middle District of Alabama has recently and correctly summarized the proper standard of review for deciding a motion for preliminary injunction as follows:

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court." Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002). To prevail on a motion for a preliminary injunction, the plaintiff bears the burden of demonstrating that

7

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd., 557 F.3d 1177, 1198 (11th Cir. 2009) (quoting Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000)). "'A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites.'" Id. (quoting All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc., 887 F.2d 1535, 1537 (11th Cir. 1989)).

Sylvan Learning, Inc. v. Gulf Coast Educ., Inc., No. 1:10-CV-450-WKW [WO], 2010 WL 3943643, at *1, 2010 U.S. Dist. LEXIS 107160, at *3 (M.D. Ala. Oct. 6, 2010).

## IV.     Analysis

### a.     Substantial Likelihood of Success on the Merits

#### 1.     Trademark Infringement

To prevail on a claim of trademark infringement . . . , plaintiffs must establish: (1) that they possess a valid mark, (2) that the defendants used the mark, (3) that the defendants' use of the mark occurred "in commerce," (4) that the defendants used the mark "in connection with the sale . . . or advertising of any goods," and (5) that the defendants used the mark in a manner likely to confuse consumers. See 1-800 Contacts, Inc. v. WhenU.com, Inc., 414 F.3d 400, 406-07 (2d Cir. 2005); People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 364 (4th Cir. 2001). . . .

Seven factors are relevant when determining whether a likelihood of confusion exists:

> (1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion.

8

> Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000). "The findings as to each factor, and as to the ultimate conclusion regarding whether or not a likelihood of confusion existed, are subject to the clearly erroneous standard of review." Frehling Enters., Inc. v. Int'l Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir. 1999).

N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1218-20 (11th Cir. 2008).

In addition, "the Lanham Act's requirement that a franchisor demonstrate that *unauthorized* trademark use occurred to prevail on the merits of a trademark infringement claim against a franchisee necessitates some type of showing that the franchisor properly terminated the contract purporting to authorize the trademarks' use, thus resulting in the *unauthorized* use of trademarks by the former franchisee." McDonald's Corp. v. Robertson, 147 F.3d 1301, 1308 (11th Cir. 1998) (emphasis in original). Therefore, the Court must first determine if Sylvan has a substantial likelihood of success on the merits of its claim that Defendants use of its trademark was unauthorized (i.e. that the contracts were properly terminated).

All three agreements contain provisions that they be interpreted according to Maryland law. If a provision of an agreement is not enforceable under Maryland law, then that provision is to be interpreted under the laws of the state in which the agreement's territory lies.

Sylvan has a substantial likelihood of success on its claim that the Alabama Agreement was properly terminated. The agreement expressly states that "[a]ny act by Licensee or *any person listed on the signature page hereof* that . . . results in *any charge of, conviction of* or pleading of nolo contendere *to a felony*[]" constitutes a "material, non-curable" breach of that agreement by which Sylvan may terminate that agreement. (Doc. 1-1 at 22, ¶ 10.3) (emphasis added). It is uncontested that Richard Blow, a signatory to that agreement, was charged with and convicted of two felony counts in the Southern District of Alabama while the Alabama

Agreement was in effect. Because Sylvan has properly terminated the Alabama Agreement, the agreement's license to use Sylvan's trademarks is no longer in effect.

Whether the Mississippi Agreements were properly terminated is less clear, as their terms detailing "material, non-curable" breaches differ from those in the Alabama Agreement. In those agreements, "material, non-curable" breaches include "[t]he insolvency, bankruptcy, or reorganization of the Licensee under the bankruptcy laws[]" and "[t]he conviction of Licensee of a felony or misdemeanor relevant to the operation of the Center." (Doc. 1-2 at 20-21, ¶ 10.3; Doc. 1-3 at 22-23, ¶ 10.3). LSI is named as "Licensee" in the Mississippi Agreements, (Doc. 1-2 at 2; Doc. 1-3 at 2), and no evidence has been presented showing that this entity committed any act constituting a breach under either of these provisions.

Both agreements contain provisions stating that "[f]or purposes of this Agreement 'Licensee' may be an individual, corporation, partnership or other legal entity and shall include any corporation, partnership, individual or combination of individuals, or other legal entity which owns a majority interest of Licensee . . ." (Doc. 1-2 at 25, ¶ 20; Doc. 1-3 at 27, ¶ 20). Richard Blow has recently filed for bankruptcy, (Doc. 19), and he has been convicted of two felonies (though it is not immediately clear whether these felonies are "relevant to the operation of" Sylvan Centers). However, the Mississippi Agreements both list Richard Blow as owning a fifty-percent interest in LSI, with the other fifty percent held by Martha Blow, against whom no evidence of actions constituting breach has been introduced. (Doc. 1-2 at 30; Doc. 1-3 at 30, 32). Such a division of interest continues to this day. (Transcript, Motion Hearing of May 25, 2011). As such, Richard Blow does not own a majority interest in Licensee LSI and may not also be considered a "Licensee" under the Mississippi Agreements.

Sylvan attempts to characterize Richard Blow as being a "Licensee" under the License Agreements by pointing to language on the agreements' signature pages stating that "[i]f Licensee is a corporation . . . [t]he shareholders . . . agree to be bound by the License Agreement . . . and agree to the restrictions on them . . ." (Doc. 1-2 at 28, 30; Doc. 1-3 at 30), to Richard Blow's guaranty agreements in which he "guarantees performance and payment by Licensee of all obligations that Licensee now in on the future owes or may owe to Sylvan[,]" (Doc. 1-2 at 38; Doc. 1-3 at 36), to Richard Blow's status as "President, Treasurer, Director, agent and owner of LSI . . .[,]" (Doc. 3 at 10), and to his being a signatory to the agreements. These guarantees do not refute the finding that by the terms of Sylvan's own agreements, Richard Blow, as an individual, is not a "Licensee" under those agreements. Thus, neither Richard Blow's felony convictions nor his bankruptcy filing form a basis for terminating the Mississippi Agreements.

Sylvan's only remaining recourse to justify termination of the Mississippi Agreements is to show that a "material, non-curable" breach occurred through "[a]ny act causing an incurable tarnishment of Sylvan's reputation." (Doc. 1-2 at 20, ¶ 10.3; Doc. 1-3 at 22, ¶ 10.3). Such a provision is quite broad and ambiguous - it is unclear who could even be held responsible for committing such an act.

The Maryland Court of Appeals has stated:

. . . Maryland adheres to the principle of the objective interpretation of contracts. Our task in determining the meaning of a contract is necessarily focused on the four corners of the agreement. When the clear language of a contract is unambiguous, the court will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used. In contrast, a contract is ambiguous if it is subject to more than one interpretation when read by a reasonably prudent person. If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract. It is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument.

<u>John L. Mattingly Constr. Co. v. Hartford Underwriters Ins. Co.</u>, 999 A.2d 1066, 1074 (Md. 2010) (internal citations and quotations omitted).

A reasonably prudent person would have difficulty in determining whether "any act causing an incurable tarnishment of Sylvan's reputation" must be committed by a "Licensee" (which, as has been determined, Richard Blow is not) or may also be committed by a signatory, or any person with some connection to the Sylvan Center or the agreement, or even any person at all. A reasonably prudent person would most likely determine that such an act must be committed by the "Licensee," as most of the other "Material Breaches That Cannot Be Cured" specifically refer in some way to actions by the "Licensee." (Doc .1-2 at 20-21, ¶ 10.3; Doc. 1-3 at 22-23, ¶ 10.3). In addition, the first paragraph in the section headed "Termination" in each agreement discusses procedures for default and termination notices "[i]f Licensee is in breach of any material provision of this Agreement . . ." (Doc. 1-2 at 18, ¶ 10.1; Doc. 1-3 at 20, ¶ 10.3).

As such, this provision is ambiguous with respect to whom it applies, and under Maryland law the Court must construe it against the drafter of the License Agreements, Sylvan. The "incurable tarnishment" provision is not applicable to Richard Blow. Therefore, Sylvan has presented no valid grounds for terminating the Mississippi Agreements and may not now claim trademark infringement pursuant to these agreements, as their trademark licenses are still in effect. Because the Alabama Agreement is the only License Agreement shown to be properly terminated, Sylvan may only pursue injunctive relief pursuant to that agreement. Thus, the Court's analysis of the Mississippi Agreements are at an end for the purposes of this order.

The Alabama Agreement clearly provides that the Licensee's license to use Sylvan's Licensed Marks does not extend beyond termination of the agreement. (Doc. 1-1 at 5-6).

12

Moreover, Defendants admit that they continue to operate their Alabama learning center as a Sylvan Center, using Sylvan signs and Sylvan promotional material. (Transcript, Motion Hearing of May 25, 2011). After considering the factors set forth in <u>Axiom Worldwide Inc.</u>, <u>supra</u>, the Court finds that, in addition to satisfying the other elements of a trademark infringement claim, Defendants' unauthorized use of Sylvan's Licensed Marks is likely to cause confusion among consumers. <u>See also</u> <u>McDonald's Corp.</u>, 147 F.3d at 1308 (When terminated franchisee continue to operate as if they are still licensed franchisees, there exists "a substantial likelihood of confusion - indeed, a certainty of confusion - " of the terminated franchisees' products with the franchisor's certified products.), <u>Burger King Corp. v. Mason</u>, 710 F.2d 1480, 1492 (11th Cir. 1983) ("The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement."). Therefore, the Court finds that Sylvan has shown a substantial likelihood of success on the merits of its trademark infringement claims pursuant to the Alabama Agreement.

## 2.     Breach of Contract

As was stated previously, the License Agreements are interpreted under Maryland law, to the extent that their provisions are enforceable under such law. The post-termination obligations called for in the Alabama Agreement do not appear unreasonable or objectionable to the Court, and Defendants have admitted that they have not fulfilled these obligations. (Transcript, Motion Hearing of May 25, 2011). Therefore, Sylvan has shown a substantial likelihood of success on the merits of its claims for breach of Defendants' post-termination obligations pursuant to the Alabama Agreement. <u>See</u> <u>Prosperity Sys., Inc. v. Ali</u>, Civil No. CCB-10-2024, 2010 WL 5174939, at * 3, 2010 U.S. Dist. LEXIS 132414, at *7 (D. Md. Dec. 15, 2010) ("PSI is also

likely to prevail on its breach of contract claims. There is no dispute that Mr. Ali is in breach of his post-termination contractual obligations . . . [T]he franchise agreement requires Mr. Ali to assign to PSI all telephone numbers used in association with his PIZZA BOLI'S restaurant, to return all copies of the PIZZA BOLI'S manual, and to destroy all materials bearing the PIZZA BOLI'S mark following the termination of the agreement . . . Mr. Ali has fulfilled none of these obligations.").

As to the non-compete covenant in the Alabama Agreement, Defendants do not contest that they continue to operate a learning center in the same location as they did before Sylvan terminated the agreement. (Transcript, Motion Hearing of May 25, 2011). The Court finds that Sylvan's non-compete covenant is reasonable and enforceable under Maryland law and does not conflict with Alabama public policy. See Gulf Coast Educ., Inc., 2010 WL 3943643, at *2-8, 2010 U.S. Dist. LEXIS 107160, at *4-23; Smallbizpros, Inc. v. Court, 414 F. Supp. 2d 1245, 1248 (M.D. Ga. 2006) ("To prevail on its claim based on Defendants' alleged breach of the covenant not to compete, Plaintiff must show that Defendants are violating an enforceable covenant not to compete."). Unlike the non-compete covenant analyzed in Gulf Coast Education, Inc., which geographically applied to a twenty mile radius around any Sylvan Center in operation when the agreement became effective, the non-compete covenant in the present case geographically applies only to the territory governed by the Alabama Agreement and any area within five miles of the border of that territory. See also NaturaLawn of Am., Inc. v. West Grp., LLC, 484 F. Supp. 2d 392, 396, 399-400 (D. Md. 2007) (applying Maryland law, finding enforceable a restrictive covenant limiting the defendant from engaging in the same type of business that the franchise operated within 20 miles of the licensed territory for two years). As

such, Sylvan has also demonstrated a substantial likelihood of success on the merits of its claims

for breach of its non-compete covenant in the Alabama Agreement.

### b. Irreparable Injury

The Eleventh Circuit has stated the analysis for determining irreparable injury as follows:

> It is well-settled that "equitable relief is available only in the absence of an adequate remedy at law." See [Mitsubishi Int'l Corp v. Cardinal Textile Sales, Inc., 14 F.3d 1507,] 1518 [(11th Cir. 1994)]; Deckert v. Independence Shares Corp., 311 U.S. 282, 289, 61 S. Ct. 229, 233, 85 L. Ed. 189 (1940) ("That a suit to rescind a contract induced by fraud and to recover the consideration paid may be maintained in equity, at least where there are circumstances making the legal remedy inadequate, is well established.") (emphasis added). The critical question is whether there exists an adequate remedy at law, not whether the moving party prefers one remedy to another. See Rosen v. Cascade Int'l, Inc., 21 F.3d 1520, 1531 (11th Cir. 1994) (instructing that the "test of the inadequacy of a remedy at law is whether a judgment could be obtained, not whether, once obtained it will be collectible.") (internal marks omitted) . . .

> Irreparable injury "must be neither remote nor speculative, but actual and imminent." [Siegel v. LePore, 234 F.3d 1163,] 1176 [(11th Cir. 2000)] (internal marks omitted). Moreover, if an injury can be "undone through monetary remedies," it is not irreparable. Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990).

> > The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

> Id. (quoting Sampson v. Murray, 415 U.S. 61, 90, 94 S. Ct. 937, 953, 39 L. Ed. 2d 166 (1974)); see also BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005) (stating that "[e]conomic losses alone do not justify a preliminary injunction").

SME Racks, Inc. v. Sistemas Mecanicos Para, Electronica, S.A., 243 F. App'x 502, 503-04 (11th

Cir. 2007) (per curiam).

### 1. Trademark Infringement

As to the determination of irreparable injury in trademark infringement claims, the

Eleventh Circuit has made note of a possible change in analysis:

> [O]ur prior cases do extend a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim. Our circuit has acknowledged as much on several occasions. See, e.g., Tally-Ho, Inc. v. Coast Cmty. Coll. Dist., 889 F.2d 1018, 1029 (11th Cir. 1989) (" 'It is generally recognized in trademark infringement cases that (1) there is not [an] adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm.' " (quoting Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir. 1982))); McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998).

> Nonetheless, . . . a recent U.S. Supreme Court case calls into question whether courts may presume irreparable harm merely because a plaintiff in an intellectual property case has demonstrated a likelihood of success on the merits. See generally eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006). In eBay, after a jury had found patent infringement by the defendant, the district court denied the plaintiff's motion for permanent injunctive relief. Id. at 390-91, 126 S. Ct. at 1839. In so doing, the district court "appeared to adopt certain expansive principles suggesting that injunctive relief could not issue in a broad swath of cases." Id. at 393, 126 S. Ct. at 1840. On appeal, the Federal Circuit reversed the denial of injunctive relief, articulating a categorical rule that permanent injunctions shall issue once infringement is established. Id. at 393-94, 126 S. Ct. at 1841. The Supreme Court reversed the Federal Circuit and admonished both the district and appellate courts for applying categorical rules to the grant or denial of injunctive relief. Id. at 394, 126 S. Ct. at 1841. The Court stressed that the Patent Act indicates "that injunctive relief 'may' issue only 'in accordance with the principles of equity.' " Id. at 393, 126 S. Ct. at 1839. Because the Court concluded "that neither court below correctly applied the traditional four-factor framework that governs the award of injunctive relief, [it] vacated the judgment of the Court of Appeals, so that the District Court may apply that framework in the first instance." Id. at 394, 126 S. Ct. at 1841. The Supreme Court held that while "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, . . . such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards." Id.

Although eBay dealt with the Patent Act and with permanent injunctive relief, a strong case can be made that eBay's holding necessarily extends to the grant of preliminary injunctions under the Lanham Act. Similar to the Patent Act, the Lanham Act grants federal courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a) (2006). Furthermore, no obvious distinction exists between permanent and

preliminary injunctive relief to suggest that eBay should not apply to the latter. Because the language of the Lanham Act -- granting federal courts the power to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable" -- is so similar to the language of the Patent Act, we conclude that the Supreme Court's eBay case is applicable to the instant case.

However, we decline to express any further opinion with respect to the effect of eBay on this case. For example, we decline to decide whether the district court was correct in its holding that the nature of the trademark infringement gives rise to a presumption of irreparable injury. In other words, we decline to address whether such a presumption is the equivalent of the categorical rules rejected by the Court in eBay. We decline to address such issues for several reasons. First, the briefing on appeal has been entirely inadequate in this regard. Second, the district court has not addressed the effect of eBay. Finally, the district court may well conclude on remand that it can readily reach an appropriate decision by fully applying eBay without the benefit of a presumption of irreparable injury, or it may well decide that the particular circumstances of the instant case bear substantial parallels to previous cases such that a presumption of irreparable injury is an appropriate exercise of its discretion in light of the historical traditions. See eBay, 547 U.S. at 394-97, 126 S. Ct. at 1841-43 (concurring opinions of Chief Justice Roberts and Justice Kennedy, representing the views of seven Justices). Accordingly, we also vacate the preliminary injunction as it applies to the trademark infringement claim, and remand to the district court for further proceedings not inconsistent with this opinion, and with eBay.

Axiom Worldwide, Inc., 522 F.3d at 1227-28.

The Eleventh Circuit has made no further attempt to clarify eBay's application to Lanham Act claims. See Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1320 (11th Cir. 2010) ("Because the district court did not rely on a presumption of irreparable injury, we need not decide whether such a presumption still applies in the wake of eBay. Even in the absence of a presumption, the district court's conclusion as to the likelihood of irreparable harm was not an abuse of discretion.") The district courts of the Eleventh Circuit have taken varying approaches in addressing this issue. At least one has taken Axiom Worldwide to mean that irreparable harm can no longer be presumed by a finding of success on the merits in a trademark infringement claim. See Internetshopsinc.com v. Six C Consulting, Inc., Civil Action No. 1:09-CV-00698-

17

JEC, 2011 WL 1113445, at *6, 2011 U.S. Dist. LEXIS 31222, at *16 (N.D. Ga. Mar. 24, 2011) ("[D]efendant argues that an injunction is not warranted because plaintiff has failed to show that it suffered an irreparable injury . . . In support of its argument, defendant correctly notes that the Court cannot presume irreparable harm based on a finding of infringement . . . See N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1227-28 (11th Cir. 2008)[.]").  At least one other has ignored the issue of eBay entirely.  See Tiramisu Int'l LLC v. Clever Imps. LLC, 741 F. Supp. 2d 1279, 1287 (S.D. Fla. 2010) ("The Eleventh Circuit has also noted that 'our prior cases do extend a presumption of irreparable harm once a plaintiff establishes a likelihood of success on the merits of a trademark infringement claim.' N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1227 (11th Cir. 2008). In its opinion, the court referenced its earlier decision in Tally-Ho, Inc. v. Coast Community College Dist., 889 F.2d 1018, 1029 (11th Cir. 1989), in which it stated, 'it is generally recognized in trademark infringement cases that (1) there is not adequate remedy at law to redress infringement and (2) infringement by its nature causes irreparable harm.'")

Some have noted, then sidestepped, the issue.  See Burger King Corp. v. Cabrera, No. 10-20480-Civ-GRAHAM/TORRES, 2010 WL 5834869, at *9, 2010 U.S. Dist. LEXIS 141413, at *26-27 (S.D. Fla. Dec. 29, 2010) ("[W]e have no need to decide whether a court may still presume irreparable injury upon finding a likelihood of confusion in a trademark case, a difficult question indeed. Obviously, Plaintiff cannot obtain the benefit of the presumption in the instant case, where the Court finds no substantial likelihood that Plaintiff will prevail on the merits of its Lanham Act claim."), Ultimate Resort Holdings, LLC v. Ultimate Resort Network, LLC, No. CV408-070, 2009 WL 2032036, at *3 n. 4, 2009 U.S. Dist. LEXIS 57892, at *10 n.4 (S.D. Ga.

18

July 8, 2009) ("Although the Eleventh Circuit Court of Appeals has held open the question of whether the presumption of irreparable harm in trademark cases has survived eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), the Court has not applied the presumption because it is not necessary to establish irreparable harm in this case. See N. Am. Med. Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1228 (11th Cir. 2008).").

Many have chosen to simply make findings of irreparable harm rather than rely solely on presumption. See Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC, 703 F. Supp. 2d 1307, 1316 (S.D. Fla. 2010) ("Though eBay, Inc. v. MercExchange, L.L.C. . . . does not categorically foreclose the possibility of a presumption upon a showing of likelihood of success on the merits, North American Medical Corp. v. Axiom Worldwide, Inc., 522 F.3d 1211, 1228 (11th Cir. 2008), Plaintiff has failed to demonstrate a likelihood of success on the merits. I find there is no presumption of irreparable injury and further, that Plaintiff has not demonstrated a likelihood of irreparable injury."), Sound Surgical Techs., LLC v. Rubinstein, 734 F. Supp. 2d 1262, 1277-1278 (M.D. Fla. 2010) ("even if Plaintiff is not entitled to a presumption of irreparable harm,[] the Court finds that Plaintiff has shown a substantial threat of consumer confusion and resulting irreparable harm to its reputation and the goodwill represented by its marks."), Chanel, Inc. v. Mesadieu, No. 6:08-cv-1557-Orl-31KRS, 2009 WL 2496586, at *7, 2009 U.S. Dist. LEXIS 70669, at *16-17 (M.D. Fla. August 12, 2009) ("In North American Medical Corporation v. Axiom Worldwide, Inc., . . . the Eleventh Circuit declined to decide whether a presumption of irreparable injury in a trademark infringement case "is the equivalent of the categorical rules rejected by the [Supreme] Court in eBay[]" . . . instead remanding the case to the district court to determine whether irreparable harm was shown without reliance on the presumption, among

other things . . . Accordingly, I examine the well-pleaded allegations . . . to determine whether irreparable harm has been shown without reliance on the presumption."), <u>Nike, Inc. v. Austin</u>, No. 6:09-cv-796-Orl-28KRS, 2009 WL 3535500, at *5-6, 2009 U.S. Dist. LEXIS 100779, at *13-14 (M.D. Fla. Oct. 28, 2009) (same as <u>Chanel, Inc.</u>, <u>supra</u>), <u>Miranda v. Guerrero</u>, No. 08-22326-CIV-MORENO/TORRES, 2009 WL 1381250, at *7, 2009 U.S. Dist. LEXIS 40898, at *16-18 (S.D. Fla. May 14, 2009) ("In <u>eBay</u>, the Supreme Court rejected application of categorical rules to the grant of denial or injunctive relief . . . [A] recent Eleventh Circuit opinion appears to have extended its holding to trademark infringement actions under the Lanham Act. <u>See</u> <u>N. Am. Med. Corp. v. Axiom Worldwide, Inc.</u>, 522 F.3d 1211, 1227-28 . . . Nonetheless, regardless of whether irreparable harm may still be presumed in trademark infringement cases, we find, based on the record evidence before us, that Plaintiff will indeed suffer irreparable harm if Defendant continues operating the website . . ."), <u>FSC Franchise Co., LLC v. Express Corporate Apparel, LLC</u>, No. 8:09-CV-454-T-23TGW, 2009 WL 3334138, at *5, 2009 U.S. Dist. LEXIS 92879, at *10-11 (M.D. Fla. Oct. 06, 2009) ("The Eleventh Circuit has said that "a sufficiently strong showing of likelihood of confusion caused by trademark infringement may by itself constitute a showing of irreparable harm." <u>McDonald's Corp. v. Robertson</u>, 147 F.3d 1301, 1310 (11th Cir. 1998). That principle would seemingly support a finding of irreparable harm in this case. <u>But</u> <u>see</u> <u>North American Medical Corp. v. Axiom Worldwide Inc.</u>, <u>supra</u>, 522 F.3d at 1227-28 . . . In all events, the plaintiff's unrefuted evidence . . . clearly presents a clear threat of irreparable harm to the plaintiff's name and goodwill.").

Since the Court has already determined that Sylvan has demonstrated a substantial likelihood of success on the merits of its trademark infringement claim, the Court finds there is a

presumption of irreparable injury in this claim as well. However, in light of <u>eBay</u> and <u>Axiom</u>, and out of an abundance of caution, a determination of whether the evidence demonstrates an actual threat of irreparable injury as to Sylvan's trademark infringement claim will also be made.

Baldwin has already agreed that Sylvan would be entitled to injunctive relief in the event of trademark infringement because its remedy at law would be inadequate. (Doc. 1-1 at 25, ¶ 12, <u>supra</u>). Such a provision in a contract is not binding on the Court, and without more it does not establish irreparable injury. <u>See</u> <u>Anago Franchising, Inc. v. CHMI, Inc.</u>, No. 09-60713-CIV-ALTONAGA/Brown, 2009 WL 5176548, at *11, 2009 U.S. Dist. LEXIS 123352, at *31-32 (S.D. Fla. Dec. 21, 2009) (A provision of a franchise agreement stating that, upon breach of the agreement, the franchisor "is entitled to an injunction without showing or proving any actual damage . . . 'is not alone dispositive of the issue of irreparable harm, and does not insulate a plaintiff seeking a preliminary injunction from the need to prove that it will suffer imminent irreparable injury as a result of the [defendant's] conduct.'" (quoting <u>Boston Laser, Inc. v. Qinxin Zu</u>, No. 3:07-CV-0791, 2007 U.S. Dist. LEXIS 78021, 2007 WL 2973663, at *12 (N.D.N.Y. Sept. 21, 2007) (alteration added) (citations omitted)), <u>State Comm'n on Human Rels. v. Talbot Cnty. Det. Ctr.</u>, 803 A.2d 527, 542 (Md. 2002) ("The mere assertion that apprehended acts will inflict irreparable injury is not enough."). <u>But see</u> <u>Great Am. Ins. Co. v. Conart Inc.</u>, No. 1:05-cv-038(WLS), 2006 WL 839197, at *6, 2006 U.S. Dist. LEXIS 17787, at *16-17 (M.D. Ga. Mar. 29, 2006) (In finding irreparable injury, the court stated only that "[d]efendants acknowledge in the Agreement that Plaintiff has no adequate remedy at law. The Agreement clearly states that the undersigned Defendants' failure to deposit 'immediately upon demand, the sum demanded by the Surety as payment shall cause irreparable harm to the Surety for which the Surety has no

adequate remedy at law . . .['] Therefore, the Court finds that absent enforcement of the Agreement, Plaintiff has no adequate remedy at law.").

However, courts have found such a provision to be at least persuasive in determining irreparable injury in a trademark infringement context.  See Dunkin' Donuts Franchised Rests. LLC v. Kev Enters., 634 F. Supp. 2d 1324, 1336 (M.D. Fla. 2009) (in addition to presumption of irreparable harm, citing provision in agreement stating "FRANCHISEE further agrees that any unauthorized use of the Proprietary Marks during the term of or after expiration or the earlier termination of this Agreement shall constitute an incurable default causing irreparable harm subject to injunctive relief[]" in finding that a substantial threat of irreparable harm had been established), Dunkin' Donuts Franchised Rests. LLC v. Cardillo Capital, Inc., No. 2:07-cv-278-FtM-29SPC, 2007 WL 2209245, at *5, 2007 U.S. Dist. LEXIS 54921, at *14 (M.D. Fla. July 30, 2007) (same).

The Eleventh Circuit has held:

"[G]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. Irreparable injury can also be based upon the possibility of confusion." Pappan Enters., Inc. v. Hardee's Food Sys., Inc., 143 F.3d 800, 805 (3d Cir. 1998)(citing Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 196 (3d Cir. 1990)(holding that the lack of control over one's mark "creates the potential for damage to . . . reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.")); Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc., 754 F.2d 91, 95 (2d Cir. 1985)(holding that irreparable injury "exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial."). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another." Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc., 846 F.2d 1079, 1092 (7th Cir. 1988)(citation omitted). A plaintiff need not show that the infringer acted in such a way as to damage the reputation of the plaintiff. It is the loss of control of one's reputation by the adoption of a confusingly similar mark that

supplies the substantial threat of irreparable harm.

Ferrellgas Partners, L.P. v. Barrow, 143 F. App'x 180, 190-91 (11th Cir. 2005).

Because Defendants continue to operate their Alabama learning center as a Sylvan Center without Sylvan's permission, Sylvan can no longer control the Defendants' operation of that Sylvan Center pursuant to the terms of the Alabama Agreement. Thus, Sylvan has lost control of its reputation and its ability to control the nature and quality of the services Defendants provide through the center. Sylvan has admitted as much in open court.

For these reasons, the Court finds that Sylvan stands to suffer irreparable harm from Defendants' unauthorized use of its trademarks in the operation of their Alabama Sylvan Center.

### 2. Breach of Contract

As with trademark infringement, Baldwin has already agreed that Sylvan would be entitled to injunctive relief in the event that the non-compete covenant is breached because its remedy at law would be inadequate. (Doc. 1-1 at 25, ¶ 12, supra). As was stated previously, such a provision is not alone dispositive in establishing irreparable injury. See Anago Franchising, Inc., supra, State Comm'n on Human Rels., supra, though such provisions have been found to be at least persuasive in finding irreparable harm in a breach of contract. See Wine Not, Int'l v. 2atec, LLC, No. 8:06-CV-117-T-23TGW, 2006 WL 1766508, at *10, 2006 U.S. Dist. LEXIS 46218, at *25 (M.D. Fla. June 26, 2006) (noting, among other things, that "by executing the Non-Competition Agreement, [Defendant] acknowledged that a breach of its provisions will result in irreparable harm."). Cf. E. A. Renfroe & Co. v. Moran, 249 F. App'x 88, 93 (11th Cir. 2007) (upheld district court's finding of irreparable injury, which included the observation that the appellants "'expressly acknowledged in writing the virtual impossibility of

quantifying the damages that would be caused by a breach of confidentiality, and expressly . . . authorized the remedy of a preliminary injunction as appropriate.'").

In upholding a district court's grant of a preliminary injunction enforcing a covenant not to compete, the Eleventh Circuit held that "the loss of customers and goodwill is an 'irreparable' injury." Ferrero v. Associated Materials, Inc., 923 F.2d 1441, 1449 (11th Cir. 1991) (citing Spiegel v. City of Houston, 636 F.2d 997 (5th Cir., Unit A, 1981)). See also BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC, 425 F.3d 964, 970 (11th Cir. 2005) (citing Ferrero for same proposition). In finding that a gym franchisor had not demonstrated irreparable harm by a former franchisee's operation of a different gym in violation of a covenant not to compete, the Middle District has applied the holding of Ferrero as follows:

> Curves International has not shown that loss of goodwill and customers is likely if this court does not immediately enjoin Lewis from operating Jordan's Gym.

> Curves International has not lost customers as a result of the existence of Jordan's Gym; nor is there evidence that anyone has confused, or is likely to confuse, Jordan's Gym with a Curves franchise. Jordan's Gym boasts a large sign that states clearly, "Jordan's Gym." . . . Moreover, the equipment used at Jordan's Gym is not the same equipment used in Curves gyms, and, while some of equipment in Jordan's Gym was arranged similarly to the way Curves International arranges its equipment, there is nothing the record to substantiate that such an arrangement is unique to Curves. And, finally, while a Curves International official testified that it might be difficult, or even "impossible," to convince a new franchisee to open a Curves franchise near Jordan's Gym, the official offers nothing other than this bare assertion to make the point.

> A claim of irreparable injury "must be neither remote nor speculative, but actual and imminent." Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting Tucker Anthony Realty Corp. v. Schlesinger, 888 F.2d 969, 973 (2d Cir. 1989)). Curves International's allegation of loss goodwill does not meet this prerequisite. Compare BellSouth Telecommunications, Inc.[v. MCImetro Access Transmission Servs., LLC, 425 F.3d 964,] 970 [(11th Cir. 2005)] (record showed that, in the absence of an injunction, "BellSouth was losing about 3200 customers per week"); Spiegel v. City of Houston, 636 F.2d 997, 1001-02 (5th Cir. 1981) (record showed business had decreased 50%

in the absence of an injunction) with Rubenstein v. Bauman, No. 1:07cv798, 2007 U.S. Dist. LEXIS 78537, 2007 WL 3120258 (M.D. Ala. Oct. 23, 2007) (Thompson, J.) (adopting magistrate judge's opinion denying a preliminary injunction where speculative assertions lacked evidence).

Curves Int'l, Inc. v. Mosbarger, 525 F. Supp. 2d 1310, 1314-15 (M.D. Ala. 2007).

Like the franchisor in Curves International, Sylvan has not presented evidence showing that it has lost customers as a result of Defendants' continued operation of their Alabama Sylvan Center or that it has had difficulty attracting new franchisees to the territory. Sylvan's bare assertions that such harm will occur do not show "actual and imminent" irreparable injury. The Court is also not convinced by Sylvan's arguments that its entire franchise system would break down if a preliminary injunction is not issued enforcing the Alabama Agreement's non-compete covenant. See Anago Franchising, Inc., 2009 WL 5176548, at *12, 2009 U.S. Dist. LEXIS 123352, at *41 ("[W]hile Anago claims the value of its master franchise agreements will be diminished and its business model threatened unless it can enforce the covenant not to compete in this case, 'a denial of this preliminary injunction does not mean that [Anago] will be unable to enforce the covenant. It simply means that [Anago] must seek to enforce it at a later stage of the legal proceedings. . . . A denial . . . will not encourage other franchisees that they can abandon their franchise agreements as they may be held liable for doing so.'" (quoting Pirtek USA, LLC v. Zaetz, 408 F. Supp. 2d 81, 86 (D. Conn. 2005) (alterations added))).

Unlike the franchisor in Curves International, Sylvan can show that Defendants continue to operate and hold out their Alabama learning center as a licensed Sylvan Center, and that the equipment and materials they use to operate the center are Sylvan proprietary materials. Moreover, Defendants continue to operate their unlicensed Sylvan Center in the same location as their licensed Sylvan Center, whereas Jordan's Gym in Curves International, Inc. was never

25

associated with the Curves International franchise.  However, any such harm from this activity can be eliminated though a preliminary injunction based on Sylvan's trademark infringement claims, as well as the enforcement of some of the Alabama Agreement's post-termination obligations.  Cf. Gandolfo's Deli Boys, LLC v. Holman, 490 F. Supp. 2d 1353, 1361 (N.D. Ga. 2007) ("[I]f a former franchisee infringes the franchisor's trademark, the proper recourse is to seek an injunction against the continued use of that mark, not to shut down the entire business[.]").

The Court finds that the following post-termination obligations of the Alabama Agreement are due to be enforced by preliminary injunction in the interest of preventing consumer confusion and protecting Sylvan's customers and goodwill:

- Baldwin "shall cease to do business under any name incorporating or similar to SYLVAN LEARNING CENTER and shall cease to use any and all of the Licensed Marks, proprietary programs, systems, techniques, or materials."  (Doc. 1-1 at 23, ¶ 11.1.1).

- Baldwin shall "remove . . . all signs, designs and insignia in any way indicating or suggesting that Licensee's business establishment is related to or connected with Sylvan, its subsidiaries, or affiliates, or any of Sylvan's licensees."  (Id. at 23-24, ¶ 11.1.3).

- Baldwin shall cease to use any of the listed or unlisted telephone numbers used by the Alabama learning center while it was a licensed or unlicensed Sylvan Center, as well as any telephone numbers listed in telephone directories under the name "Sylvan" or some other name "confusingly similar thereto."  (Id. at 24, ¶ 11.1.4).

- "Except as provided in Paragraph 11.2" of the Alabama Agreement, Baldwin shall

"immediately refrain from engaging in any and all contacts with customers" it solicited while operating as either a licensed or unlicensed Sylvan Center, "whether with respect to providing service to customers, or for any other purpose whatsoever." (Id., ¶ 11.1.5).

The failure to grant injunctive relief as to any remaining post-termination obligations, to the extent they are not incidentally enforced by injunctive relief on Sylvan's trademark infringement claim, will not result in irreparable damage that cannot be compensated at law . Because the granting of preliminary injunctive relief as to trademark infringement and as to the above-listed post-termination obligations will remove the demonstrated irreparable harm of Defendants' breach of the non-compete covenant, the Court will not grant injunctive relief as to the non-compete covenant at this time.

     **c.**     **Balance of Harm**

          **1.**          **Trademark Infringement**

In determining the balance of harms, "[t]he inquiry is whether the probable loss of consumer goodwill outweighs the cost of delay to the defendant who will be unable to sell the product using the trademark until a decision is reached on the merits." Cardillo Capital, Inc., 2007 WL 2209245, at *5, 2007 U.S. Dist. LEXIS 54921, at *14 (citing Davidoff & Cie, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001)). In a case in which a terminated franchisee continued to use the franchisor's licensed marks and otherwise continued to operate two stores as though they were licensed franchises, the Middle District of Florida proceeded to apply this inquiry as follows:

> The issuance of a preliminary injunction will result in the defendants being forced to lay off twenty-five employees and suffering substantial financial difficulties as a result of the continued payment of rent on the leases of the two Naples donut stores .
> . . However, a denial of the preliminary injunction will result in Dunkin' Donuts

losing all control over its trademark throughout the course of this litigation, as well as virtually immeasurable losses to the goodwill it has built over the years. After careful review of the harm to the parties, the Court finds that the plaintiffs have established that the harm they will suffer if the preliminary injunction is not granted narrowly outweighs the harm defendants will suffer if a preliminary injunction is granted.

Id. at WL *6, LEXIS *14-15.

No specific evidence has been provided that being unable to use Sylvan's Licensed Marks will force Defendants' Alabama learning center to close or lay off employees. Even assuming such things would come to pass, however, the Court agrees with the analysis in Cardillo Capital, supra, and finds that such consideration is still outweighed by Sylvan's loss of goodwill and of the control of its marks should an injunction not issue.

Moreover, "a franchisee that has breached the terms of its franchise agreement cannot then complain of harm from an injunction preventing further use of the franchisor's trademarks." Dunkin' Donuts Franchised Rests. LLC v. D&D Donuts, Inc., 566 F. Supp. 2d 1350, 1361 (M.D. Fla. 2008) (citing, e.g., S & R Corp. v. Jiffy Lube Int'l. Inc., 968 F.2d 371, 379 (3d Cir. 1992), and Burger King Corp. v. Majeed, 805 F. Supp. 994, 1006 (S.D. Fla. 1992)). Harm resulting from Defendants' failure to comply with the Alabama Agreement is a "self-inflicted injury" which is decisively outweighed by the immeasurable loss to Sylvan's goodwill. See id. at 1361-62. But see Scotts Co. v. United Indus. Corp., 315 F.3d 264, 283-284 (4th Cir. 2002) ("[T]he district court gave impermissibly short shrift to the question of the harm that would be visited upon the defendants. The harm to a defendant, particularly a defendant in a false advertising case, could almost always be described as of the defendant's own making. If self-made harm is given substantially less weight, . . . then the balance of the harms will almost always favor the plaintiff, thus transforming a preliminary injunction from an extraordinary remedy into a routine

occurrence. And when the purpose behind the requirement that the court balance the harms is recognized, it becomes apparent that it is error to dismiss as self-inflicted the harms that might be suffered by a defendant if an injunction were to issue.").

### 2. Breach of Contract

Any harm suffered by Defendants resulting from the enforcement of the post-termination obligations designated above, in Section IV(b)(2), is "self-inflicted" injury caused by Defendants' breach of the Alabama Agreement and is outweighed by the consideration that Defendants knowingly agreed to such obligations when entering the contract. See Dunkin' Donuts Franchised Rests. LLC v. D&D Donuts, Inc., supra.

### d. Public Interest

### 1. Trademark Infringement

As has already been determined, Sylvan has adequately demonstrated that Defendants' continued use of Sylvan's Licensed Marks at its Alabama learning center will likely cause confusion among consumers. Because "the public interest is served by preventing consumer confusion in the marketplace[,]" Davidoff & Cie, S.A. v. PLD Int'l Corp., 263 F.3d 1297, 1304 (11th Cir. 2001), a preliminary injunction enjoining Defendants' unlicensed use of Sylvan's Licensed Marks is justified.

### 2. Breach of Contract

"As a matter of public policy, enforcement of contract terms is favored as long as said terms are not oppressive, onerous, or otherwise unconscionable." Great Am. Ins. Co., 2006 WL 839197, at *6, 2006 U.S. Dist. LEXIS 17787, at *19. See also Smallbizpros, Inc., 414 F. Supp. 2d at 1251 ("The Court [] finds that enforcement of an ostensibly enforceable covenant not to

compete would not be adverse to the public interest."). Because the post-termination obligations of the Alabama Agreement largely relate to ending Baldwin's operation of its learning center as a licensed Sylvan Center, and because none of the obligations appears overly harsh or objectionable, the public interest will be served by enforcing them as well.

## V.    Bond

Federal Rule of Civil Procedure 65(c) requires that an applicant for a preliminary injunction provide security against the potential effects of a wrongly-issued injunction . . . This Court has stated previously, in dicta, that before a court may issue a preliminary injunction, a bond must be posted, but it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court and the court may elect to require no security at all." BellSouth Telecomms., Inc., LLC, 425 F.3d at 970-71 (internal citations and quotations omitted). Because of the high likelihood of success on the merits of Sylvan claims as they pertain to the Alabama Agreement, the Court finds no need for a bond to issue.

## VI.    Conclusion

For the reasons stated, it is **ORDERED** that Sylvan's Motion for Preliminary Injunction (Doc. 2) is **GRANTED** in part and **DENIED** in part. It is hereby **ORDERED** that Defendants shall be enjoined from using Sylvan's Licensed Marks and shall comply with certain contractual post-termination obligations pursuant to terms set forth in the Preliminary Injunction issued contemporaneously herewith.

**DONE** and **ORDERED** this the **17**th day of **June, 2011**.

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**